| | |
|---|---|
| Karol Huffman, | |
| *On behalf of herself and others similarly situated*, | Case No. 4:2019-cv-00034 |
| Plaintiff, | Judge Louise Wood Flanagan |
| v. | |
| Team Carolinas, Inc., *et al*., | |
| Defendants. | |

## Plaintiffs' Motion and Memorandum in Support of Renewed Unopposed Motion to Approve Settlement

On June 1, 2020, Plaintiffs filed an unopposed motion to approve the settlement of this lawsuit. Doc. 75. On September 8, 2020, the Court denied the motion without prejudice because of several deficiencies that the Court outlined in its Order. *See* Order, ECF #79. As described herein, the parties have endeavored to cure the deficiencies and, accordingly, submit this renewed motion for settlement approval.[1] Plaintiffs respectfully request that the Court grant Plaintiffs' Motion and authorize the Parties to begin the administration and notice process.

---

[1] For the sake of completeness, this Memorandum includes all of the information from the prior memorandum in support of preliminary settlement approval. It also addresses the points that the Court raised in its September 8, 2020 Order.

# 1. Background of the Lawsuit and Claims

## 1.1. Plaintiffs' Claims

Plaintiffs delivered pizzas for a Defendants' Domino's restaurant franchise. They brought this case on behalf of themselves and similarly situated delivery drivers to recover unpaid wages claimed under the FLSA, North Carolina law, and South Carolina law.

Plaintiffs' claims predominately center on Plaintiffs' allegation that Defendants under-reimbursed delivery drivers for the expenses that drivers incurred in having to use their own cars to deliver food. Plaintiffs allege that their vehicles are "tools of the trade" under 29 C.F.R. § 531.35. Because Defendants required Plaintiffs to provide their own vehicles, Plaintiffs allege Defendants were required to adequately reimburse the drivers for the use of those cars. Defendants deny these allegations or any liability.

Plaintiffs contend that Defendants were required to either (1) reimburse each driver their actual vehicle expenses or (2) reimburse each driver at the IRS business mileage rate. *See, e.g., Hatmaker v. PJ Ohio, LLC*, No. 3:17-cv-146, 2019 WL 5725043, *7 (S.D. Ohio Nov. 5, 2019). In this case, Plaintiffs allege that, because Defendants did not record actual expenses, they are required to reimburse at the IRS rate. Defendants, on the other hand, argue that they are permitted to reimburse a "reasonable approximation" of the drivers' expenses, and that they have done so. *See, e.g., Perrin v. Papa John's Int'l, Inc.*, 114 F. Supp. 3d 707 (E.D. Mo. July 8, 2015).

Plaintiffs also assert both North Carolina state law claims and, at the time the settlement was reached, had moved to amend their Complaint to also assert South Carolina state law claims relating to Defendants' reimbursement practices and other alleged violations. In the Court's Order, ECF #79, the Court asked Plaintiffs to more fully describe Plaintiffs' state law claims,

particularly as the claims compare to each other. ECF #79, p. 7. Plaintiffs' various legal claims are discussed below.

### 1.1.1. Plaintiffs' FLSA Claims

Plaintiffs' FLSA legal theory is described above. In sum, Plaintiffs allege that Defendants' reimbursement rate was inadequate and, as a result, drove their wages below the legally-mandated minimum wage. Likely more relevant to the Court's inquiry and evaluation of the settlement are the available damages and several related issues.

First, Plaintiffs' FLSA claims result in two possible types of damages—under-reimbursed vehicle expenses and the "tip credit differential."

With respect to the alleged under-reimbursed vehicle expenses, the potential damages are based on what the Court ultimately determines to be the proper reimbursement rate. As noted above, Plaintiffs allege that the proper reimbursement rate is the IRS rate. *See, e.g., Hatmaker*, 2019 WL 5725043, at *7. If Plaintiffs won on this issue, the damages would be approximately $7.7 million across all possible class members (but see below regarding the class size). Defendants allege the proper reimbursement rate is a "reasonable approximation" of the vehicle expenses. *See, e.g., Perrin*, 114 F. Supp. 3d 707. If Defendants won on this issue, they could then argue that what they paid was a "reasonable approximation." If this argument proved successful, it could reduce the damages to zero; *i.e.*, Defendants did not break the law at all. Alternatively, the Court could find that a rate higher than what Defendants paid but lower than the IRS rate is appropriate. In that case, the damages would be reduced accordingly.

With respect to the alleged "tip credit differential" claim, the potential damages are based on the theory that an under-reimbursement that triggers a tipped minimum wage violation also

terminates the employer's ability to claim a tip credit at all. In this case, the "tip credit differential" is contingent on the under-reimbursement claim. Essentially, this is an "all or nothing" claim. There are no damages if (1) Plaintiffs fail to prove an under-reimbursement claim or (2) Plaintiffs fail to prove legal entitlement to the "tip credit differential." Winning on both issues, however, would likely result in the full damages of an estimated amount equaling the under-reimbursement claim (again, see below regarding the class size).

Second, Plaintiffs could also claim entitlement to FLSA "liquidated damages" in the amount of the unpaid wages described above. Defendants would be entitled to present a defense to these damages, but they would have to prove that they acted in good faith and with a reasonable basis. *Mayhew v. Wells*, 125 F.3d 216, 220 (4th Cir. 1997). Liquidated damages, however, are the "norm." *Id.*

Third, the parties would fight over the appropriate statute of limitations. Under the FLSA, the statute of limitations is two years by default. If Plaintiffs proved Defendants acted "willfully," the statute of limitations would be extended by one year. 29 U.S.C. 255(a).

Fourth, two factors substantially influence the amount of money actually at issue: opt-in rates and arbitration.

Factor 1: No one is part of this case for FLSA purposes unless and until they affirmatively join the lawsuit. 29 U.S.C. 216(b). In this case, 397 individuals joined the case out of over 3,000 putative class members. This is an opt-in rate of about 12%. Thus, the numbers above must be reduced to reflect the actual opt-in rate to properly consider Defendants' actual exposure.

Factor 2: Approximately 38% of the putative class members signed arbitration agreements with class action waivers. Assuming an even distribution over the opt-ins, it is possible that about

150 of them could be dismissed from the case, and, if they so elected, proceed with their claims through individual arbitration. As the Court can surmise, it is unlikely that all 150 workers would proceed through individual arbitrations. Certainly, Plaintiffs do not concede that the arbitration agreements are valid, and, likewise, Defendants, by agreeing to include these workers in this settlement, do not waive any rights under their arbitration agreements.

### 1.1.2. Plaintiffs' North Carolina Law Claims

The North Carolina Plaintiffs bring a claim under N.C. Gen. Stat. 95-25.6, which requires employers to pay all wages due on an employee's "regular payday." This type of claim is commonly referred to as a "payday claim." Plaintiffs' theory of recovery is that, by virtue of the alleged failure to pay wages due under the FLSA, Defendants did not pay the employees "all wages and tips accruing to the employee on the regular payday." N.C. Gen. Stat. 95-25.6.

In addition, the North Carolina Plaintiffs bring a claim under N.C. Gen. Stat. 95-25.8, which prohibits employers from withholding or diverting employee wages without receiving prior written authorization. The theory of recovery is similar to the "payday claim": Defendants' alleged "deduction," "withholding," or "diversion" of the under-reimbursed vehicle expenses and tip credit amount violates N.C. Gen. Stat. 95-25.8.

For both claims, the statute of limitations is two years. N.C. Gen. Stat. 95-25.22(f). Like the FLSA, North Carolina law allows Plaintiffs to potentially recover liquidated damages in the same amount and subject to the same standard as under the FLSA. N.C. Gen. Stat. 95-25.22(a1).

Several points are notable on the North Carolina law claims.

First, the North Carolina law claims' damages overlap with those available under the FLSA, and the claims address the same underlying wages. Plaintiffs can only recover one set of

unpaid wages and one set of liquidated damages. Thus, the North Carolina law claims would not increase opt-in plaintiffs' recoveries.

Second, Defendants indicated their intention to raise preemption arguments. If successful, Defendants could eliminate Plaintiffs' North Carolina law claims. Although Plaintiffs believe that their claims are not preempted, this argument adds an extra defense to the North Carolina law claims that is not present with the FLSA claims.

Third, the North Carolina law claims have a shorter statute of limitations compared to the FLSA, if Plaintiffs prove Defendants acted willfully.

Fourth, Defendants will be able to argue that 38% of the putative class members cannot join the case at all because of the arbitration agreements. Moreover, Plaintiffs will need to meet the stricter Rule 23 standard (as compared to the FLSA's collective action standard) to assert claims on behalf of the North Carolina law putative class.

### 1.1.3. Plaintiffs' South Carolina Law Claims[2]

The South Carolina Plaintiffs bring similar "payday" and diversion/withholding/ deduction claims under S.C. Code Ann. 41-10-40(C) and (D). Thus, the legal theories of recovery and relevant facts are essentially the same as the North Carolina law claims. As with the North Carolina claims, Defendants indicated their intention to argue preemption.

There are two differences between the South Carolina and North Carolina claims. First, South Carolina law allows for a three-year statute of limitations. S.C. Code Ann. 41-10-80(C). Second, South Carolina law allows an employee to recover "an amount equal to three times the full amount of the unpaid wages." *Id.* The statute's additional damages, however, are "not

---

[2] Notably, the Amended Complaint adds a putative class representative from Defendants' South Carolina stores.

obligatory" but "permissive." *Thoroughbred Indus., Inc. v. Warren*, 14 F. App'x 248, 250 (4th Cir. 2001).

### 1.1.4. Procedural Posture of the Claims

Plaintiff Karol Huffman asserted the FLSA claims and the North Carolina state law claims on March 12, 2019. ECF #1. Plaintiffs' South Carolina state law claims, however, had not yet been formally asserted in the case at the time the parties reached their Settlement Agreement, and have still not been formally asserted. On April 9, 2020, Plaintiff Huffman filed her Motion for Leave to Amend the Complaint, which sought to add Jessica Sims as a named Plaintiff and as class representative for the South Carolina claims. ECF #61. Defendants intended to oppose Plaintiff's Motion for Leave, and briefing had not yet been completed when the parties reached their settlement. See ECF #68 (extending briefing deadlines). As part of the settlement, the parties agreed to amend the complaint to assert the South Carolina claims to effectuate the settlement.

### 1.1.5. Claim Comparison

The Court asked for a comparison of the various statutes and claims in play. Although this information can be pulled from the above discussion, it may be more useful in a summarized form.

The starting place, as described above is that the base unpaid wages claim is mirrored across all claims—FLSA, South Carolina, and North Carolina. These wages are only recoverable once.[3] The following charts separate other pertinent details:

---

[3] Plaintiffs also raised common law unjust enrichment claims under both state laws. Like the statutory claims, the unjust enrichment claims seek amounts that would likely mirror the unpaid wage amounts.

**Individuals Who Can Potentially Assert Claims**

| FLSA | Only individuals who affirmatively opt into the case. The standard to maintain the collective action is more lenient than Rule 23. |
|---|---|
| North Carolina | All North Carolina employees. The standard is Rule 23's more stringent requirements. |
| South Carolina | All South Carolina employees. The standard is Rule 23's more stringent requirements. |

**Available Damages in Addition to Unpaid Wages**

| FLSA | Amount equal to unpaid wages. Defendants can avoid if they prove they acted in good faith and with a reasonable basis. |
|---|---|
| North Carolina | Amount equal to unpaid wages. Defendants can avoid if they prove they acted in good faith and with a reasonable basis. |
| South Carolina | Amount equal to two times unpaid wages. The Damages are discretionary and a "bona fide dispute over wages due" might be enough to eliminate the additional damages. *Thoroughbred Indus., Inc.*, 14 F. App'x at 250. |

**Statute of Limitations**

| FLSA | Two years, or three years if Plaintiffs can prove Defendants acted willfully. |
|---|---|
| North Carolina | Two years. |
| South Carolina | Three years. |

**Preemption Defense Argument Availability**

| FLSA | Not available. |
|---|---|
| North Carolina | Available. |
| South Carolina | Available. |

In many ways, all three sets of laws have advantages and disadvantages. For example, South Carolina offers a longer statute of limitations than North Carolina. On the other hand, North Carolina's liquidated damages are easier to recover than South Carolina's more discretionary additional damages. Thus, it is difficult to precisely measure the value of a claim with a two-year statute of limitations and easier-to-recover double damages against a claim with a three-year statute of limitations but far more difficult-to-recover treble damages. From a procedural perspective, Plaintiffs' North Carolina claims are better-positioned, having been

asserted in the original Complaint. In this situation, Plaintiffs submit that treating the state law claims equally and basing the settlement on unpaid wages is appropriate.

Overall, however, the individuals with the strongest claims are those who have joined the lawsuit and asserted their FLSA claims. This is because those individuals (1) do not need to rely on the Court certifying a Rule 23 class, (2) have access to the most easily recoverable liquidated damages, (3) are not subject to a preemption defense, and (4) have the potential to prove entitlement to a three-year statute of limitations.

## 1.2. Procedural History

Plaintiff Huffman filed this lawsuit on March 12, 2019.

On April 24, 2019, Plaintiffs filed a motion to send notice of this lawsuit to similarly situated individuals. ECF # 22. Plaintiffs also filed a motion to expedite consideration of the motion to send notice. ECF # 24.

On May 3, 2019, the Parties filed a status report and a proposed order that would allow the Parties a temporary stay so that they could attempt to negotiate a settlement. ECF # 26. The status report also set forth a briefing schedule for Plaintiffs' motion to send notice, if the negotiation was unsuccessful. The Parties ultimately agreed to send a stipulated notice, if settlement negotiations were unsuccessful. ECF # 28.

On October 23, 2019, the Parties attended an in-person mediation with retried U.S. Magistrate Judge F. Bradford Stillman. The mediation did not result in an agreement to settle.

Pursuant to the Parties' stipulation, Plaintiffs sent the court-approved notice of the lawsuit to Defendants' approximately 3,285 drivers. Approximately 397 drivers submitted consent-to-join forms.

On April 9, 2020, Plaintiffs moved to amend their complaint to, in part, add South Carolina state law claims. ECF # 62. Defendants did not consent to amend the Complaint and intended to oppose this motion.

The Parties also exchanged discovery requests and initial responses and objections. By mid-April 2020, the Parties were engaged in a meet-and-confer process to address those responses and objections.

On April 23, 2020, the Parties attended a second mediation with retried U.S. Magistrate Judge Stillman. This mediation, held via Zoom, went past 8:00 PM EST. At that mediation, the Parties agreed in principle to a settlement that formed the basis of the formal settlement agreement now before the Court.

### 1.3. Defendants' Arbitration Agreements

As will be discussed in more detail below, Defendants have various potential factual and legal arguments to mitigate or eliminate some or all of Plaintiffs' claims. Defendants also have an important procedural defense—38% of the putative class members signed arbitration agreements with class action waivers.

In spite of these arbitration agreements, the Parties have agreed to include all putative class members in the settlement, even if a class member signed an arbitration agreement. In doing so, Defendants do not waive their right to enforce the agreements for any other purpose. Plaintiffs do not waive their ability to challenge the agreements for any other purpose.

## 2. Summary of Settlement Terms

### 2.1. Introduction and General Structure

The Settlement Agreement creates a fund of $3,000,000, inclusive of payments to class members, attorneys' fees, expenses, and service awards. The Settlement is designed to reflect that those individuals who opt into the case have superior claims to those who have not. In particular, those who have already joined the case have the best claims because they have stopped the FLSA statute of limitations from running on their strongest claims. To accomplish these goals, the Parties have created a settlement structure that involves multiple "rounds"[4] of payments and opportunities to make claims.

The settlement structure gives individuals multiple chances to make claims. Even if individuals do not affirmatively make a claim for settlement money, they still get money from the settlement. They simply do not get as much as someone who makes a claim (assuming the two individuals drove the same number of miles because all payments are based on miles driven).

Two points are notable at the outset.

First, no money reverts to the Defendants. Instead, the money flows through to the class members until it no longer can, at which point it is to be distributed *cy pres* to the North Carolina State Bar Indigent Person's Attorney Fund, the South Carolina Bar Foundation, and the Domino's Partners Foundation, a 503(c)(3) non-profit organization created to help Domino's employees in times of hardship and adversity.

---

[4] In order to make the fewest changes possible to the Agreement and related documents, the payment groups are still labeled "rounds," but three of the four "rounds" are all paid at the same time—following final approval. The final "round" is a fund for late claimants.

Second, the Parties have separately allocated attorney's fees (discussed below). Thus, the amounts discussed below are *after* the proposed fee award. Moreover, Plaintiffs' Counsel based their request for attorney's fees not on the entire Settlement Fund, but instead on what the Class Members receive. Thus, the fee request is approximately 24.6% of the total Settlement Fund. Further, Plaintiffs' Counsel will be paid at the same time as the various "rounds" of payment, thereby putting Counsel in the same position as their clients.

The settlement structure and distributions are as follows:

### 2.2. Round 1 FLSA Subclass

Approximately $1,020,000 is allocated to pay the claims of the approximately 397 drivers who have already filed consent-to-join forms in this lawsuit. This is based on each Round 1 FLSA Subclass Member receiving the equivalent of 1.5× their unpaid wages, calculated at a reimbursement rate of $.45 per mile. This compromise "settlement rate" has been used as a baseline measure in numerous other pizza driver settlements. *See, e.g., Arledge v. Domino's Pizza, Inc.*, No. 3:16-cv-386, 2018 WL 5023950, *1 (S.D. Ohio Oct. 17, 2018).

Based on the Court's Order (ECF #79), the parties have modified the timing of this payment. Under the revised settlement agreement, this money will be paid *after* Final Approval. The "Round 1 FLSA Subclass" money is paid at the same time as the Round 2 FLSA Subclass and Round 3 State Law Subclass payments.

### 2.3. Round 2 FLSA Subclass

Shortly after the Court grants this Motion, the Parties will send the attached Settlement Notice to all class members. Class members will then have a second chance to make a claim for

settlement funds. By signing and returning the claim form, class members opt in to the lawsuit for FLSA purposes.

The Round 2 FLSA Subclass consists of anyone signing a Claim and Release Form from May 1, 2020 until the Court grants final approval to the remainder of the settlement agreement and who does not seek to object to or exclude themselves from the settlement. $400,000 is allocated to pay those individuals, who will receive an amount equal to their unpaid wages, calculated at a reimbursement rate of $.45 per mile, or a pro rata share of the Round 2 FLSA fund if the claims, calculated at $0.45 per mile, exceed the value of the Round 2 FLSA settlement fund.

The calculation for Round 2 FLSA Subclass members is reduced from the Round 1 FLSA Subclass calculation because the FLSA statute of limitations continues to run for each class member until that person opts in to a case. Thus, those individuals who have not yet joined the case have claims that have decreased in value compared to those who have already joined the case and tolled their statutes of limitations. It is proper to account for this in a settlement. *See, e.g., Young v. Rolling in the Dough, Inc.*, No. 1:17-cv-7825, 2020 WL 969616, *2 (N.D. Ill. Feb. 27, 2020); *Brandenburg v. Cousin Vinny's Pizza, LLC*, No. 3:16-cv-516, 2019 WL 6310376, *2 (S.D. Ohio Nov. 25, 2019).

This money will be payable to the Round 2 FLSA Subclass within 40 days after the Court grants final approval of the Settlement Agreement.  In exchange for their payment, the Round 2 FLSA Subclass members will be bound, via their negotiation of their settlement check and the attached settlement agreement, to a release of their claims under the FLSA and the applicable North Carolina or South Carolina wage and hour claims. To the extent that there is any

unclaimed money from the Round 2 FLSA Subclass, it will be added to the Round 4 Contingency FLSA Subclass Fund, described below.

## 2.4. Round 3 State Law Subclass

As described in Plaintiffs' proposed Amended Complaint, Plaintiffs allege various state law theories of recovery. In doing so, Plaintiffs seek to certify a class of all of Defendants' pizza delivery drivers.

Every putative class member who does not receive a check under Round 1 or Round 2 will be part of the "State Law Subclass." The settlement allocates $500,000 to the State Law Subclass. This money will be divided among the State Law Subclass Members based on their miles driven and will be payable to the Round 2 FLSA Subclass within 40 days after the Court grants final approval of the Settlement Agreement. State Law Subclass members will receive no less than $25.00. In exchange for their payment, the Round 3 State law Subclass members will be bound, via their negotiation of their settlement check and the attached settlement agreement, a release of their claims under the applicable North Carolina or South Carolina wage and hour claims.

Any un-cashed amounts sent to the State Law Subclass will be added to the Round 4 Contingency FLSA Subclass.

## 2.5. Round 4 Contingency FLSA Subclass

Finally, $300,000, plus any unclaimed amounts from the above Rounds 2 and 3 of distribution, will go into a "Contingency FLSA Fund." This money will be available to anyone who makes a claim from the date of the Court's final approval of the settlement until April 30, 2023.

Any class member who makes a claim during this time will receive an amount equal to their unpaid wages, calculated at a reimbursement rate of approximately $.45 per mile. These claims, however, will be reduced to the extent that any of the class members' claims fall outside of the FLSA statute of limitations and to the extent that the class member received any money from the Round 3 State law Subclass Fund. The FLSA Contingency FLSA Fund will be distributed to those class members who make claims annually on April 15, 2021, April 15, 2022 and May 15, 2023 and will be paid pro rata to the extent that the funds are insufficient to reimburse class members at $.45 per mile.

At the end of the Round 4 claims period, any undistributed money will be divided, pro rata based on miles driven, first to any class member who filed a claim and was reimbursed less than $.176 per mile and then to any class member who cashed any settlement check. The distribution is limited to people who cashed a check in order to avoid sending checks to incorrect addresses or to people who are completely uninterested in the settlement. The distribution is also limited in that there must be enough money left to send each eligible class member at least $10. If there is not enough money for this minimum distribution, the money will be distributed *cy pres* to the North Carolina State Bar Indigent Person's Attorney Fund, the South Carolina Bar Foundation, and the Domino's Partners Foundation.

Checks may be cashed or negotiated within 160 days, after which time they will become void. The proceeds of any voided checks distributed from the Round 4 FLSA Contingency Fund will be distributed *cy pres* to the North Carolina State Bar Indigent Person's Attorney Fund, the South Carolina Bar Foundation, and the Domino's Partners Foundation.

### 2.6. Release

The settlement's release of claims differentiates between Class Members who submit Claim Forms during any of the rounds of payments and Class Members who do not.

All Class Members who do not exclude themselves from the settlement will release their state law claims arising out of the facts asserted in the lawsuit. Agreement, § 6(D). Those Class Members will not, however, release their FLSA claims unless they (1) have already joined the case to assert FLSA claims or (2) submit a Claim Form. For Class Members who have either joined the case or submitted a Claim Form, they will also release their FLSA claims arising from the facts asserted in the lawsuit. *Id.* § 6(B).

The two Named Plaintiffs will also execute a general release in consideration for the service award, contingent upon the Court awarding $10,000 to Ms. Huffman and $2,500 to Ms. Sims. *Id.* at §5(E).

### 3. Settlement Procedure

The parties have modified the settlement procedure to be in accord with the Court's Order. The steps are described below.

*Step 1: Preliminary Approval.* The Parties ask that the Court preliminarily approve the settlement so that they can begin the notice process for drivers who have not yet opted into the suit.

*Step 2: Notice.* During the notice process, class members will receive notice of the settlement and the opportunity to file a claim, opt out, or object. The Round 1 FLSA Subclass members do not need to file a claim to participate in the case, since they have already done so.

*Step 3: Final Approval.* Following the notice period, the Parties will ask the Court to evaluate the settlement and grant final approval of the remainder of the settlement, including the remaining fees, expenses, and distributions. Class members can continue to make claims for settlement funds until April 30, 2023.

The Parties envision the following schedule:

| | |
|---|---|
| Within 14 days of the Court granting this Motion | - The Claims Administrator will transmit the Notice of Settlement via regular mail and email. |
| 60-day notice period | - Class members will have 60 days to file a claim form, object, or exclude themselves from the settlement. |
| Within 30 days of the notice period closing | - Plaintiffs will provide Defendants with a copy of a proposed motion for final approval. Defendants will provide comments and edits to the motion. Plaintiffs will file the motion. |
| Within 40 days of the Court's final settlement approval | - The Claims Administrator will pay the Round 1 FLSA Subclass Members, Round 2 FLSA Subclass Members, the service awards, the expense award, and the portion of fees attributable to the Round 1 FLSA Subclass and Round 2 FLSA Subclass payments.<br><br>- The Claims Administrator will pay the State Law Subclass Members and the portion of fees attributable to the State Law Subclass payments. |
| April 30, 2021 | - The Claims Administrator will pay any money due to class members making claims from the Contingency FLSA Fund received before April 15, 2021 and the portion of fees attributable to these payments. |
| April 30, 2022 | - The Claims Administrator will pay any money due to class members making claims from the Contingency FLSA Fund received before April 15, 2022 and the portion of fees attributable to these payments. |
| May 15, 2023 | - The Claims Administrator will pay any money due to class members making claims from the Contingency FLSA Fund received before April 30, 2023 and the portion of fees attributable to these payments.<br><br>- The Claims Administrator will distribute all remaining funds to the class members who have cashed any previous check (assuming minimum payments of $10/person can be |

| | made) and pay the portion of fees attributable to these payments. |
|---|---|
| Approximately 160 days after all checks have been mailed | - The Claims Administrator will distribute all remaining unclaimed funds to the Domino's Partners Foundation. |

### 4. Preliminary approval of the Settlement is appropriate because it is fair, adequate, and reasonable.

There is a strong judicial policy in favor of settlement, in order conserve scarce resources that would otherwise be devoted to protracted litigation. *See In re Jiffy Lube Sec. Litig.*, 927 F.2d 155, 158-59 (4th Cir. 1991); *In re Microstrategy, Inc., Sec. Litig.*, 148 F.Supp.2d 654m 663 (E.D. Va. 2001); *see also Ehrheart v. Verizon Wireless,* 609 F.3d 589, 594-95 (3d Cir. 2010) (there is an "especially strong" presumption in favor of voluntary settlements "in class actions…where substantial judicial resources can be conserved by avoiding formal litigation"); Newberg §§ 11.41 ("The compromise of complex litigation can be encouraged by the courts and favored by public policy."). This includes the "strong initial presumption" in class action cases "that the compromise is fair and reasonable." *In re Microstrategy*, 148 F.Supp.2d at 663 (internal quotations omitted).

With respect to approving an FLSA settlement, courts look at whether the settlement is a fair and reasonable resolution of a bona fide dispute. *Patel v. Barot*, 15 F. Supp. 3d 648, 654 (E.D. Va. 2014).

With respect to a class settlement, preliminary approval is the first step in the settlement process. *See Horton v. Merrill Lynch, Pierce, Fenner, & Smith, Inc.*, 855 F. Supp. 825, 827 (E.D.N.C. 1994). It allows the notice to issue and for class members to object or opt out of the

settlement. Preliminary approval "is at most a determination that there is what might be termed 'probable cause' to submit the proposal to class members and hold a full-scale hearing as to its fairness." *In re Outer Banks Power Outage Litig.*, No. 17 Civ. 141, 2018 WL 2050141, *2-5 (E.D.N.C. May 2, 2018) (quoting *Menkes v. Stolt-Nielsen S.A.*, 270 F.R.D. 80, 101 (D. Conn. 2010)). In other words, the purpose of preliminary approval is for the court to determine that the proposed settlement is "sufficiently within the range of reasonableness." *Id.* at *3 (citations omitted).

Courts assess a proposed class settlement to determine whether, as a whole, it is fair, reasonable, and adequate to class members. *United States v. North Carolina*, 180 F.3d 574, 581 (4th Cir. 1999); Fed. R. Civ. P. 23(e)(2). The Fourth Circuit has advised courts to evaluate the following factors in determining whether to approve a class action settlement: (1) whether the settlement was the product of good faith bargaining, at arm's length, and without collusion; (2) the relative strength of the Parties' cases, as well as the uncertainties of litigation on the merits, and the existence of difficulties of proof or strong defenses that the plaintiffs are likely to encounter at trial; (3) the complexity, expense, and likely duration of additional litigation; (4) the solvency of defendants and the likelihood of recovery on a litigated judgment; and (5) the degree of opposition to the settlement by class members. *In re Jiffy Lube Sec. Litig.*, 927 F.2d at 159; *see also Flinn v. FMC Corp.*, 528 F.2d 1169, 1173 (4th Cir. 1975). These factors support approval here.

### 4.1. The proposed Settlement is the product of good-faith bargaining during extensive, arm's-length negotiations between experienced counsel.

In determining if a class settlement was reached in good faith, the Fourth Circuit advises courts to examine: (1) the posture of the case at the time settlement was proposed; (2) the extent

of discovery that has been conducted; (3) the circumstances surrounding the negotiations; and (4) the experience of counsel in the area of class action litigation. *In re Jiffy Lube Sec. Litig.*, 927 F.3d at 159.

First, the case's posture and circumstances surrounding the negotiations show that the settlement was negotiated in good faith. On October 23, 2019, the Parties attended an all-day mediation with retired U.S. Magistrate Judge F. Bradford Stillman. The case did not settle at that time. Instead, the Parties sent the stipulated FLSA collective action notice to the 3,285 putative class members, 397 of whom joined the lawsuit. The Parties also exchanged discovery requests and initial responses and objections. The Parties were engaged in meet and confer efforts regarding those responses and objections. At about the same time, on April 23, 2020, the Parties attended a mediation via Zoom, again with retired Magistrate Judge Stillman. The mediation went until 8:00 PM EST and ultimately resulted in a settlement in principle, which developed into the formal settlement agreement now before the Court.

Second, although discovery had just begun, the Parties exchanged sufficient information relevant to calculating Defendants' alleged potential exposure and the class's alleged potential damages. Thus, both Parties were able to properly evaluate the case's strengths and weaknesses for settlement purposes. *See In re Jiffy Lube Sec. Sec. Litig.*, 927 F.2d at 159 (approving settlement, holding that although the settlement was reached early in the litigation before formal discovery had occurred, "documents filed by plaintiffs and evidence obtained through informal discovery yielded sufficient" information).

Third, counsel for both Parties are experienced in the specific area of "pizza delivery driver lawsuits," having battled over relevant issues in courts throughout the country. Through

those cases, counsel have litigated many of the key issues that arise in these disputes, including motions to dismiss, motions for summary judgment, and motions for class certification. Courts in this circuit give substantial weight to the experience of the attorneys who prosecuted and negotiated the class settlement. *In re MicroStrategy*, 148 F. Supp. 2d at 665 (holding "appropriate for the court to give significant weight to the judgment of class counsel that the proposed settlement is in the interests of their clients and the class as a whole, and to find that the proposed settlement is fair").[5] As discussed above, the proposed settlement resulted from arm's-length negotiations between counsel well-versed in pizza delivery driver wage and hour law. *See generally* Declaration Andrew Kimble ("Kimble Decl.) attached as Exhibit 2.

Finally, Plaintiffs' counsel are well-versed in this area of law and the strengths and weaknesses of the claims at issue. *See Brandenburg v. Cousin Vinny's Pizza, LLC*, No. 3:16-cv-516, 2019 WL 6310376, *6 (S.D. Ohio Nov. 25, 2019) ("The Court is familiar with Class Counsel's work in this and other cases like it. The 'pizza delivery driver' cases require substantial expertise and firm resources to pursue. The Court agrees that Class Counsel's work in this area is exemplary…"); *see also Mullins v. Southern Ohio Pizza, Inc.*, No. 1:17-cv-426, 2019 WL 275711, *5 (S.D. Ohio Jan. 18, 2019) ("Plaintiff's Counsel [Biller & Kimble, LLC], having established an expertise in 'pizza delivery driver' litigation, have expended thousands of hours on similar cases which informed and enhanced their representation of Plaintiff here."). Counsel are able to assess the strengths and weaknesses of the claims, based on the data and information exchanged.

---

[5] *See also, e.g., In re Bldg. Materials Corp. of Am. Asphalt Roofing Shingle Prod. Liab. Litig.*, No. 11 Mn. 02000, 2014 WL 12621614, *4 (D.S.C. Oct. 15, 2014); *Muhammad v. Nat'l City. Mortg., Inc.*, No. 07 Civ. 423, 2008 WL 5377783, *4 (S.D. W. Va. Dec. 19, 2008) (citing Newberg § 11.28); *In re The Mills Corp. Sec. Litig.*, 265 F.R.D. 246, 255 (E.D. Va. 2009).

### 4.2. The relative strength of the Parties' positions and complexity of protracted litigation support approval of the Settlement.

The second factor considers the relative strength of the Parties' cases, as well as the uncertainties of litigation on the merits, and the existence of difficulties of proof or strong defenses that the plaintiffs are likely to encounter at trial. Factor three considers the complexity, expense, and likely duration of additional litigation. Both of these factors favor approval.

In evaluating the strength of a case's merits, courts refrain from reaching conclusions on issues that have not been fully litigated. *See S.C. Nat. Bank v. Stone*, 139 F.R.D. 335, 339 (D.S.C. 1991) (citing *Carson v. American Brands, Inc.*, 450 U.S. 79, 88 n. 14 (1981)). Because the object of settlement is to avoid, not confront, the determination of contested issues, the approval process should not be converted into an abbreviated trial on the merits. *Flinn v. FMC Corp.*, 528 F.2d 1169, 1172-73 (4th Cir. 1975) (noting that the settlement hearing is not "a trial or a rehearsal of the trial").

Plaintiffs drove vehicles to deliver pizzas, and Defendants reimbursed the drivers for the use of those vehicles. Defendants' data reflects that they reimbursed the drivers an average of $.2733 per mile. Aside from those basic facts, however, the Parties vigorously dispute the law as it applies to those facts.

As described above, Plaintiffs contend that Defendants must either keep records of and reimburse the drivers' actual expenses or reimburse at the IRS business mileage rate. Defendants contend that they may reimburse a "reasonable approximation" of the expenses. The Fourth Circuit has not decided this issue.

Resolution of this issue in Plaintiffs' favor would result in approximately $7.7 million in unpaid wages (unliquidated) across the maximum possible timeframe. Resolution of this issue in

Defendants' favor would allow them to argue that the amount they reimbursed was a reasonable approximation, potentially resulting in no liability at all.

Putting aside this fundamental legal dispute, additional factors would play into the potential, recoverable damages.

First, the above amount assumes that 100% of the putative class joined the case for purposes of bringing an FLSA claim. In reality, 12% joined the case.

Second, approximately 38% of the putative class signed arbitration agreements with class action waivers. Assuming that those agreements were held to be valid, those individuals would recover nothing from this case and, instead, would be forced to individually arbitrate their claims.

Third, the above damages number assumes that Plaintiffs are able to prove Defendants' acted "willfully" under the FLSA, thus increasing the two-year statute of limitations to three years. Defendants contest that they are liable at all, let alone that they acted willfully.

It is significant that this settlement will distribute money to individuals based on the maximum possible statute of limitations *and* allow every putative class member, even those who signed arbitration agreements, multiple opportunities to receive settlement funds.

In addition to Plaintiffs' FLSA claims, Plaintiffs also brought state law claims under South Carolina and North Carolina law. These claims were subject to legal and procedural challenges from Defendants, including Defendants' anticipated argument that the claims were entirely preempted by the FLSA.

Plaintiffs recognize that Defendants had many ways of potentially reducing any award, even to zero. Thus, this case presented substantial uncertainty, which this settlement eliminates.

Indeed, "[i]f settlement has any purpose at all, it is to avoid a trial on the merits because of the uncertainty of the outcome." *In re Ira Hupt & Co.*, 304 F.Supp. 917, 934 (S.D.N.Y. 1969).

As it stands, the settlement represents an excellent recovery for the various subclasses described above. When a settlement assures immediate payment of substantial amounts to class members, "even if it means sacrificing speculative payment of a hypothetically larger amount years down the road," settlement is reasonable. *Gilliam v. Addicts Rehab. Ctr. Fund.*, No. 05 Civ. 3452, 2008 WL 782596, *5 (S.D.N.Y. Mar. 24, 2008) (internal quotation marks and citations omitted). Finally, those who do not take part in this settlement do not waive their FLSA claims (only their state law claims, for which they still receive a payment). By establishing a Contingency FLSA Fund and having the Court retain jurisdiction over the settlement, this settlement provides an easy avenue for any of those individuals to receive a payment under the agreement and likewise serves the interests of judicial economy.

This settlement is an excellent result and strongly favors approval.

### 4.3. Defendants' solvency was not evaluated in this case.

The Fourth Circuit advises courts to consider a defendant's ability to pay any subsequent judgment and the availability or lack thereof of insurance proceeds. *See Jiffy Lube*, 927 F.2d at 159. Because the settlement is appropriate on the merits of the case and is not reduced to account for any collectability concerns, the Parties did not evaluate Defendants' solvency. Thus, this is a neutral factor. To the extent relevant, Defendants had no insurance that would cover the claims in this case.

### 4.4. Degree of opposition to the Settlement voiced by Class Members can be evaluated at final approval.

Finally, "[t]he attitude of the members of the class, as expressed directly or by failure to object, after notice, to the settlement is a proper consideration for the trial court…" *Flinn*, 528 F.2d at 1173. Once Class Members have been notified of the settlement, the Court will be in a better position to fully analyze this factor after notice is issued and Class Members have had an opportunity to opt out or object to the settlement. Thus, this factor is to be determined.

In sum, the terms of the proposed settlement are fair and reasonable, as evidenced by application of the relevant Fourth Circuit factors, which support preliminary approval of the settlement.

## 5. Certification of the Settlement Class is Appropriate.[6]

Courts throughout the country faced with whether to certify a Rule 23 class in the pizza delivery driver reimbursement context have granted class certification. *See, e.g., McFarlin v. The Word Enterprises, LLC*, No. 16-cv-12536, 2017 WL 4416451 (E.D. Mich. Oct. 5, 2017); *Brandenburg*, 2018 WL 5800594; *Bass v. PJ COMN Acq. Corp.,* No. 09-cv-01614, 2011 WL 2149602 (D. Colo. Jun. 1, 2011); *Perrin*, 2013 WL 6885334; *Oregel v. PacPizza, LLC,* No. C12-

---

[6] Subject to the approval of the Court, and for settlement only, Defendants do not contest whether Plaintiff has satisfied the requirements for class certification pursuant to Rule 23. Further, Defendants have agreed not to contest the statements made in this motion regarding class and collective action certification for purposes of settlement only and the agreement expressly provides that Defendants make no admission. (Agreement ¶11(A)). Accordingly, any class certification order entered in this Action pursuant to the Settlement Agreement shall not constitute a waiver or admission, in this or in any other proceeding, by Defendants of a finding or evidence that Plaintiffs' claims, the claims of any person in the Settlement Class, or any Released Claims are appropriate for class treatment, or that any requirement for class certification is otherwise satisfied in this Action. Defendants in no way waive their respective rights to challenge Plaintiffs' allegations that a class may be certified in this Action, in the event that the Settlement Agreement does not become effective for any reason. Likewise, except for the Settlement, Defendants in no way waive their right to enforce the arbitration agreement and in the event that the Settlement is not approved Defendants retain such right.

01454, 2014 WL 10585672 (Sup. Ct. of Contra Costa Cnty. May 14, 2014); *Behaein v. Pizza Hut, Inc.,* No. BC541415 (Sup. Ct. of L.A. Cnty. Jul. 15, 2015).

Plaintiffs' case is no different. For settlement purposes, Plaintiffs seek to certify the following class:

> All current and former delivery drivers employed from March 12, 2016 to April 30, 2020 at the Team Carolinas Domino's stores owned, operated, and/or controlled by Defendants.

Under Rule 23(a), a class action may be maintained if all of the prongs of Rule 23(a) are met, as well as one of the prongs of Rule 23(b). Rule 23(a) requires that:

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative Parties are typical to the claims or defenses of the class; and

(4) the representative Parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). Rule 23(b)(3) requires the Court to find that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

A potential settlement "is a relevant consideration when considering class certification." *Temp Servs., Inc. v. Am. Int'l Grp., Inc.*, No. 08 Civ. 271, 2012 WL 4061537, *1 (D.S.C. Sept. 14, 2012). "If not a ground for certification *per se*, certainly settlement should be a factor, and an important factor, to be considered when determining certification." *Id.* (citing *In re A.H. Robins Co., Inc.*, 880 F.2d 709, 740 (4th Cir. 1989) (*abrogated by Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997)).

"Ultimately, approval of a class action settlement is committed to the sound discretion of district courts to appraise the reasonableness of particular class-action settlements on a case-by-case basis, in light of the relevant circumstances." *In re Microstrategy*, 148 F.Supp. 2d at 663 (quoting *Evans v. Jeff D.*, 475 U.S. 717, 742 (1986)) (internal quotations omitted).

### 5.1. Numerosity

Numerosity requires that the class be so numerous that "joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "There is no mechanical test for determining whether in a particular case the requirement of numerosity has been satisfied." *Kelley v. Norfolk & W. Ry.*, 584 F.2d 34, 35 (4th Cir. 1978). However, the Fourth Circuit has indicated that a class with over 30 members is numerous enough to satisfy this inquiry. *See Williams v. Henderson*, 129 F. App'x 806, 811 (4th Cir. 2005) (citing 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1762 (2d ed. 1986)).

The putative class here consists of over 3,000 delivery drivers in North Carolina and South Carolina. Approximately one third of the drivers are from the South Carolina stores. Accordingly, the settlement class meets Rule 23(a)'s numerosity requirement.

### 5.2. Commonality

Rule 23(a)(2) requires that the Court find that "there are questions of law or fact common to the class." "Commonality is satisfied where there is one question of law or fact common to the class, and a class action will not be defeated solely because of some factual variances in individual grievances." *Jeffreys v. Commc'ns Workers of AM.*, *AFL-CIO*, 212 F.R.D. 320, 322 (E.D. Va. 2003); *see also Woodard v. Online Info. Servs.*, 191 F.R.D. 502, 505 (E.D.N.C. 200) (citing *Holsey v. Armour & Co.*, 743 F.3d 199, 216-217 (4th Cir. 1984).

The standard is a liberal one that cannot be defeated by the mere existence of some factual variances in individual grievances among class members. *Jeffreys*, 212 F.R.D. at 322; *Mitchell-Tracey v. United Gen. Title Ins. Co.*, 237 F.R.D. 551, 557 (D. Md. 2006) (finding that factual differences among class members will not necessarily preclude class certification "if the class members share the same legal theory."). The commonality requirement is met where the defendant engaged in a common course of conduct. *See Fisher v. Va. Elec. & Power Co.*, 217 F.R.D. 201, 223 (E.D. Va. 2003). The commonality requirement does not, however, mandate complete identity of a plaintiffs' claims with those of the class. *See id.* at 212.

Here, Plaintiffs allege that all members of the class are unified by common factual allegations---that all class members were subjected to the same mileage reimbursement and compensation policy. As described above, Plaintiffs allege that the members of the class (or classes if broken up by state) share a common set of facts and legal questions. Plaintiffs maintain that these common issues predominate over any issues affecting only individual class members. *See, e.g.*, *McFarlin*, 2017 WL 4416451, *3; *Perrin*, 2013 WL 6885334, *5 *Brandenburg*, 2018 WL 5800594, *3.

### 5.3. Typicality

Rule 23(a)(3) requires that the Court find that "the claims or defenses of the representative Parties are typical of the claims or defenses of the class." In the typicality analysis, "[a] class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Lienhart v. Dryvit Sys., Inc.*, 255 F.3d 138, 146 (4th Cir. 2001). "Nevertheless, the class representatives and the class members need not have identical factual and legal claims in all respects. The proposed class satisfies the typicality requirement if

the class representatives assert claims that fairly encompass those of the entire class, even if not identical." *Fisher*, 217 F.R.D. at 212.

In this case, "[b]ecause the claims of the representative Parties are [alleged to be] same as the claims of the class, the typicality requirement is satisfied." *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 339 (4th Cir. 2006). Like the putative class, the named Plaintiffs, Karol Huffman, a North Carolina driver, and Jessica Sims, a South Carolina driver, contend they were subject to Defendants' mileage reimbursement policy. Typicality is met because promoting Plaintiffs' interest will "simultaneously tend to advance the interests of absent class members." *Deiter v. Microsoft Corp.*, 436 F.3d 461, 466 (4th Cir. 2006). Typicality has been repeatedly found in the pizza delivery driver mileage under-reimbursement context. *See McFarlin*, 2017 WL 4416451, *4; *Oregel,* 2014 WL 10585672, *1; *Bass*, 2011 WL 2149602, *3; *Brandenburg*, 2018 WL 5800594, *4.

### 5.4. Adequacy of Named Plaintiffs and their Counsel

Rule 23(a)(4) requires that "the representative Parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "[T]he class representatives must adequately represent the interests of class members, and legal counsel must be competent to litigate for the interests of the class." *Jeffreys*, 212 F.R.D. at 323. "Basic due process requires that the named plaintiffs possess undivided loyalties to absent class members." *Fisher*, 217 F.R.D. at 212 (citing *Broussard v. Meineke Disc. Muffler Shops*, 155 F.3d 331, 338 (4th Cir. 1998)).

The adequacy of representation requirement is met here. Plaintiffs understand and have accepted the obligations of class representatives, have adequately represented the interests of the putative class, and have retained experienced counsel who have handled numerous wage and hour

class actions. Decl. Kimble at ¶¶ 34-39. Moreover, there is no evidence that Plaintiffs have interests that are antagonistic to or at odds with those of putative Class Members. Instead, Plaintiffs are alleged to have suffered the same wage and hour violations as the putative class.

Plaintiffs' Counsel also met the adequacy requirement of Rule 23(a)(4). *Id.* (collecting cases discussing the expertise of Plaintiffs' counsel in pizza delivery driver wage and hour class actions).

### 5.5. Certification is Proper under Rule 23(b)(3).

Rule 23(b)(3) requires that common questions of law or fact not only be present, but also that they "predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). This inquiry examines "whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Tyson Foods Inc. v. Bouaphakeo*, 136 S.Ct. 1036, 1045 (2016) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997)). For the purposes of settlement, these requirements are met.

### 5.5.1. Common Questions Predominate

The Rule 23(b)(3) predominance inquiry tests whether the proposed class is "sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc.*, 521 U.S. at 623. The predominance inquiry focuses on the balance between individual and common issues. *Brown v. Nucor Corp.*, 785 F.3d 895, 917-21 (4th Cir. 2015). Common issues of law and fact predominate "where the same evidence would resolve the question of liability for all class members." *Beaulieu v. EQ Indus. Servs., Inc.*, No. 06 Civ. 400, 2009 WL 2208131, *20 (E.D.N.C. July 22, 2009); *see*

*Stillmock v. Weis Mkts.*, 385 F. App'x 267, 273 (4th Cir. 2010); *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 428 (4th Cir. 2003).

Here, Plaintiffs' common contention—Defendants under-reimbursed delivery drivers for expenses incurred making deliveries on Defendants' behalf—predominate over any issues affecting only individual Class Members. Plaintiffs' Amended Complaint alleges no conduct or claims particular to Plaintiffs that were not practiced upon every member of the class in the same manner. Importantly, whether a putative class member worked in North Carolina or South Carolina is of no moment for this analysis because, as discussed *supra*, there is a strong similarity between the claims raised for the North and South Carolina drivers. Accordingly, the issues of fact arising from Defendants' alleged conduct predominate over any individual issues, making class treatment appropriate here. Thus, the predominance inquiry is satisfied.

### 5.5.2. A class action is a superior mechanism

Rule 23(b)(3) sets forth a non-exclusive list of factors pertinent to judicial inquiry into the superiority of a class action, including: the class members' interests in individually controlling the prosecution or defense of separate actions; whether individual class members wish to bring, or have already brought, individual actions; and the desirability of concentrating the litigation of the claims in the particular forum. Fed. R. Civ. P. 23(b)(3). Courts should consider "whether Rule 23 is sufficiently effective to justify the expenditure of the judicial time and energy that is necessary to adjudicate a class action and to assume the risk of prejudice to the rights of those who are not directly before the court." *Stillmock*, 385 F.App'x at 274.

On a request for settlement-only class certification, the Court need not consider the likely difficulties in managing a class action. *See Amchem*, 521 U.S. at 620 ("Confronted with a request

for a settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems."); *Carter v. Forjas Taurus, S.A.*, 701 F. App'x 759, 765 (11th Cir. 2017); *In re Outer Banks Power Outage Litig.*, No. 17 Civ. 141, 2018 WL 2050141, *2-5 (E.D.N.C. May 2, 2018).

Here, granting conditional certification of the settlement class is superior to individual adjudication because it will conserve judicial resources and is more efficient for class members, particularly those who lack the resources to bring their claims individually. *See Capsolas v. Pasta Res., Inc.*, No. 10 Civ. 5595, 2012 WL 165920, *2 (S.D.N.Y. May 9, 2012). Plaintiffs and Class Members have limited financial resources with which to prosecute individual actions. Employing the class device here will achieve economies of scale for putative class members, conserve judicial resources, and preserve public confidence in the system by avoiding repetitive proceedings and preventing inconsistent adjudications.

### 6. Plaintiffs' Counsel should be appointed as class counsel.

Biller & Kimble and The Leon Law Firm should be appointed as Class Counsel. Rule 23(g), which governs the standards and framework for appointing class counsel for a certified class, sets forth four criteria the district court must consider in evaluating the adequacy of proposed counsel: (1) "the work counsel has done in identifying or investigating potential claims in the action"; (2) "counsel's experience in handling class actions, other complex litigation, and types of claims asserted in the action"; (3) "counsel's knowledge of the applicable law"; and (4) "the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A). The Court may also "consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class[.]" Fed. R. Civ. P. 23(g)(1)(B). The Advisory

Committee has noted that "[n]o single factor should necessarily be determinate in a given case." Fed. R. Civ. P. 23(g).

Plaintiffs' Counsel satisfy these criteria. They have done substantial work identifying, investigating, negotiating, and settling Plaintiffs' and putative Class Members' claims. Decl. Kimble at ¶¶ 4-25. Plaintiffs' Counsel have substantial experience litigating pizza delivery wage and hour class actions. *See id*. at ¶¶ 34-39. Further, courts have repeatedly found Plaintiffs' Counsel to be adequate class counsel. *See id*.; *see also, e.g., Brandenburg*, 2018 WL 5800594, *4.

**7. The proposed Class Notice and Claim Forms are appropriate.**

The Notice and Claim Forms, which are attached to Exhibit 1, the Settlement Agreement, as pp. 27-35, comply with due process and Rule 23(c)(2)(B). The Court must determine the best notice practicable under the circumstances, including individual notice to potential class members, and that the notice must concisely and clearly state in plain, easily understood language:

- The nature of the action;
- The definition of the class certified;
- The class claims, issues, or defenses;
- That a class member may enter an appearance through counsel if the member so desired;
- That the court will exclude from the class any member who requests exclusion, stating when and how members may elect to be excluded; and
- The binding effect of a class judgment on class members under Rule 23(c)(3).

Rule 23(c)(2)(B); *Good v. Life Investors Ins. Co. of America*, 672 F.3d 402, 422-423 (6th Cir. 2012).

The Notice and Claim Forms satisfy these requirements. They are written in plain English and are organized and formatted to be as clear as possible. Plaintiffs ask that the Court grant Plaintiffs' request to send the notice to all delivery drivers by mail and email.

33

Moreover, because the Parties agreed to allow class members to continue to make claims until 2023, the class action administrator will establish a website that contains the notices, an electronic claim form, and a form for class members to update their addresses. This further supports finding that the proposed notice is appropriate.

### 8. The proposed attorneys' fees and costs award is reasonable and should be approved.

Plaintiffs' Counsel ask the Court to preliminarily approve an award of attorney's fees equal to one-third of the settlement funds allocated to class members—$736,837.29. Under the Agreement, this amount is paid *separately from* the Settlement Fund. Thus, the amounts allocated to class members discussed above will not be reduced by the proposed award. The Settlement Agreement is not conditioned on an award of attorney's fees. *See* Exhibit 2 at ¶ 34.

The method of calculating fees used here results in a *lower* fee than usual awards in the Fourth Circuit.[7] Typically, fee awards are based on the entire settlement fund, inclusive of fees, expenses, and service awards. *See, e.g., Devine v. City of Hampton, Virginia*, No. 4:14cv81, 2015 WL 10793424, at *3 (E.D. Va. Dec. 1, 2015) (settlement agreement provided attorney's fees in the amount of approximately 33%); *see also Hatzey v. Divurgent, LLC*, No. 2:18-cv-191, 2018 WL 5624300, at *4 (E.D. Va. Oct. 9, 2018). Thus, because the gross settlement value here is $3,000,000, a $1,000,000 attorney fee award would be appropriate. Plaintiffs' Counsel, however,

---

[7] The Fourth Circuit examines the reasonableness of a fee request through a percentage of fund analysis subject to a lodestar cross-check. *See, e.g., Devine v. City of Hampton, Virginia*, No. 4:14cv81, 2015 WL 10793424, *3 (E.D. Va. Dec. 1, 2015); *Hatzey v. Divurgent, LLC*, No. 2:18-cv-191, 2018 WL 5624300, *4 (E.D. Va. Oct. 9, 2019) (awarding one-third of settlement fund of $2,450,000); *Hoffman v. First Student Inc.*, No. WDQ-06-1882, 2010 WL 1176641, *3 (D.Md. March. 23, 2010) ("Under the FLSA and the terms of lead class members' agreement with counsel, Plaintiffs' counsel may recover one-third of the damages award. Because this amount appropriately reflects the time spent and expenses incurred by Plaintiffs' counsel in this litigation, fees and costs are reasonable and appropriate"); *see also DeWitt v. Darlington Cty., S.C.*, No. 11 Civ. 740, 2014 WL 6408371, *9 (D.S.C. Dec. 6, 2013) (noting that "[o]ne-third of the recovery appears to be a fairly common percentage in contingency cases, especially where the settlement amount is not-so large as to produce a windfall"); *Decohen v. Abbasi, LLC*, 299 F.R.D. 469, 483 (D. Md. 2014); *Deem v. Ames True Temper, Inc.*, No. 6:10-cv-01339, 2013 WL 2285972, *4 (S.D. W. V. May 23, 2013); *Montague v. Dixie Nat. Life Ins. Co.*, No. 09 Civ. 687, 2011 WL 3626541, *2-3 (D.S.C. Aug. 17, 2011).

base their request on one-third of what the class members will receive, *exclusive* of fees and expenses. As a percentage of the gross settlement amount, the request is 24.6%.

Under the Agreement, Plaintiffs' Counsel would be paid fees at the same time the class members are paid. Thus, Plaintiffs' Counsel requests to be paid $336,837.29 at the time the Round 1 Payment is made, one-third of the Round 2 money actually distributed at the time the Round 2 and 3 payments are made, and then one third of any other amounts distributed under Round 4 at the time they are distributed. This puts Plaintiffs' Counsel in the same position as their clients.

Courts often also perform a "lodestar cross-check" to ensure that the proposed fee is reasonable. Here, Plaintiffs' Counsel's current lodestar is $184,118.00 Kimble Decl. at ¶ 23. This lodestar does not, however, tell the whole story. Because the settlement envisions a distribution process of several years, a substantial amount of additional work will go into this case, including the second round of notice, moving for final approval, and responding to class members' questions throughout the multi-year process. Even discounting the additional, anticipated work, the proposed fee award is reasonable.

The Agreement also allocates $52,650.85 to expenses and service awards. The proposed service awards are $12,500, leaving $40,150.85 for expenses. At present, Plaintiffs' Counsel have incurred $16,297.00 in expenses, mainly attributable to the collective action notice and the first mediation. Plaintiffs have received an estimate of $24,962 for the administration of the settlement agreement. This amount, however, is only an estimate. The actual expenses remaining in the case will vary. To the extent that the administration expenses exceed $40,150.85, Plaintiffs'

Counsel will bear those costs. This supports approving the amount allocated to expenses and service awards *and* Counsel's proposed fee award (which may be reduced by increased expenses).

Plaintiffs ask that the Court preliminarily approve the fees, expenses and service award amounts at this time, subject to consideration of any objections at final approval.

**9. The service award to Plaintiffs should be approved.**

The settlement agreement allocates $10,000 as a service award to Plaintiff Huffman and $2,500 to Plaintiff Sims. Named plaintiffs in class and collective action lawsuits play a crucial role in bringing justice to those who would otherwise be hidden from judicial scrutiny. *See*, *e.g.*, *Cook v. Niedert*, 142 F.3d 1004, 1006 (7th Cir. 1998) ("Because a named plaintiff is an essential ingredient of any class action, an incentive award is appropriate if it is necessary to induce an individual to participate in the suit"). This is especially true in employment litigation. *See Velez v. Majik Cleaning Servs., Inc.*, No. 03 Civ. 8698, 2007 WL 7232783, *7 (S.D.N.Y. June 25, 2007) ("[I]n employment litigation, the plaintiff is often a former or current employee of the defendant, and thus, by lending his name to the litigation, he has, for the benefit of the class as a whole, undertaken the risk of adverse actions by the employer or co-workers.").

In this case, Plaintiff Huffman was involved in every step of way. She even took the extraordinary step of opting out of Defendants' arbitration agreement. But for her doing so and bringing this case, this settlement would likely not have been possible. Plaintiff Sims agreed to represent the South Carolina class, allowing Plaintiffs to assert those particular state law claims. *See* Kimble Decl. at ¶ 21.

Plaintiff Huffman participated in the drafting of the Complaint, Motion to Send Notice, and the mediation process. *Id.* at ¶¶ 14-20. Her fellow putative Class Members stand to gain

tremendously because of her work, dedication, and sacrifice in bringing this lawsuit. "Without incentive awards, the class representatives would not be rewarded for their participation or for the risk of pursing this action with no promise of a successful outcome." *Speaks v. U.S. Tobacco Coop., Inc.*, No. 5:12-cv-729, 2018 WL 9888083, at *4 (E.D.N.C. Feb. 20, 2018). "An incentive award of $10,000 for class representatives is reasonable given their contributions to the case." *See, e.g., Kruger v. Novant Health, Inc.*, No. 1:14cv208, 2016 WL 6769066, *6 (M.D.N.C. Sept. 29, 2016); *Savani v. URS Prof'l Sols. LLC*, No. 1:06-cv-02085, 2014 WL 172503, *10 (D.S.C. Jan. 15, 2014). Accordingly, Plaintiffs' Counsel requests a $10,000 service award for Plaintiff Huffman and $2,500 to Plaintiff Sims.

## 10. Conclusion

For the reasons set forth above, Plaintiffs respectfully request that the Court grant their Motion for Preliminary Approval of the Settlement and enter the Proposed Order.

Respectfully submitted,

*/s/Phil Krzeski*
Mary-Ann Leon
N.C. State Bar No. 26476
THE LEON LAW FIRM, P.C.
704 Cromwell Dr., Ste E
Greenville, NC 27858
Telephone: (252) 830-5366
*maleon@leonlaw.org*
www.leonlaw.org
Local Rule 83.1(d) Counsel

Andrew R. Biller (Ohio Bar # 0081452)
BILLER & KIMBLE, LLC
4200 Regent Street, Suite 200
Columbus, OH 43219
Telephone: (614) 604-8759
Facsimile: (614) 340-4620
*abiller@billerkimble.com*

Andrew P. Kimble (Ohio Bar # 0093172)
Philip J. Krzeski (Ohio Bar # 0095713)
Biller & Kimble, LLC
8044 Montgomery Road, Suite 515
Cincinnati, OH 45236
Telephone: (513) 202-0710
Facsimile: (614) 340-4620
*akimble@billerkimble.com*
*pkrzeski@billerkimble.com*


*Counsel for Plaintiffs*

## Certificate of Service

The undersigned hereby certifies that a copy of the foregoing was filed through the Court's ECF system and Defendants will receive a copy through that system.


*/s/Phil Krzeski*
Philip J. Krzeski